UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------X

UNITED STATES OF AMERICA,

   - against -               **MEMORANDUM & ORDER**

RASHUN MITCHELL,              08-CR-775 (KAM)

      Defendant.

-------------------------------------X

MATSUMOTO, UNITED STATES DISTRICT JUDGE:

      Defendant Rashun Mitchell ("defendant" or "Mitchell")
was indicted on October 30, 2008, on one count of knowingly and
intentionally possessing a Hi Point 9 millimeter semi-automatic
handgun (the "handgun") and ammunition, on October 11, 2008,
having previously been convicted of a felony, in violation of 18
U.S.C. §§ 922(g)(1) and 924(a)(2).  (*See* Doc. No. 6,
Indictment.)  Presently before the court is a motion by
defendant to suppress the handgun, ammunition and post-arrest
statements.  (*See* Doc. No. 12, Defendant's Motion to Suppress.)

      The court held a suppression hearing on March 25, 2009
at which the government presented three witnesses:  New York
City Police Department ("NYPD") Officers Nathaniel Sands
("Officer Sands") and Jason Broderick ("Officer Broderick"), and
Sergeant Nickson Morency ("Sergeant Morency") (collectively, the
"testifying officers").  The defense called two witnesses:
Bernard Lee ("Lee"), an individual who was with defendant at the

time of his arrest, and the defendant himself. (*See* Doc. No. 20, Minute Entry.)

Having considered the appropriate burdens of production and proof, the testimony of witnesses for the government and defendant, the suppression hearing exhibits, the parties' written submissions, and having resolved issues of credibility, the court denies defendant's motion in its entirety. The court sets forth below the findings of fact and conclusions of law upon which this determination is based. *See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record."); *see also United States v. Miller*, 382 F. Supp. 2d 350, 361-363 (N.D.N.Y. 2005) (summarizing burdens of production and proof).

## FINDINGS OF FACT

Shortly after 2:00 a.m. on October 11, 2008, an NYPD dispatcher communicated by radio with several police officers and advised them of a dispute on the 14th floor of 265 Livonia Avenue, Brooklyn, New York, which is part of the Tilden Houses, a public housing complex under the jurisdiction of the New York City Housing Authority. (*See* Transcript of Suppression Hearing ("Tr.") 6, 10-11.) The dispatcher did not provide a description of anyone involved in the dispute, but noted the presence of a

"large group at that location . . . fighting." (Gov. Ex. 2,
Radio Transmission; *see also* Tr. 13.)  The dispatcher also did
not indicate whether any weapons were involved in the dispute.
Nevertheless, the dispatcher requested that additional officers
provide backup for a two-officer post that had been assigned to
patrol the Tilden Houses and its vicinity.  (Tr. 13.)

One of the responding officers, Officer Nathaniel
Sands, whose testimony the court finds credible, testified that
he and his partner notified the dispatcher that they would
provide back up.  Officer Sands described 265 Livonia Avenue
within the Tilden Houses as a "fairly notorious site," which is
located within a two by four block area, designated by the NYPD
as an "Impact Zone" because of the high incidence of so-called
"index" or seven major crimes, including homicide, rape,
felonious assault, robbery, burglary, grand larceny and grand
larceny auto.  (Tr. 6-7.)  In particular, Officer Sands
testified that he was personally familiar with and had been
involved in the investigation of violent crimes in and around
the Tilden Houses, such as homicides, shootings including shoot
outs with the police, stabbings, attempted rape, burning of a
stabbing victim, robbery and "constant" gang activity between
rival gang sets within the Bloods and the Crips in and around
the Tilden Houses.  (Tr. 6-10, 45, 49, 68-69.)

Indeed, Sergeant Nickson Morency, a twelve year veteran of the NYPD, and Officer Jason Broderick, a rookie, both credibly testified that prior to responding to the radio call for the Tilden Houses at 265 Livonia Avenue on the morning of October 11, 2008, they had responded earlier during their tour to at least three separate shootings in the vicinity of the Tilden Houses. (Tr. 44, 69-70.) Officer Broderick also testified that two months earlier, at a location two blocks from 265 Livonia Avenue, shots had been fired in his direction during a shooting involving over sixty shots fired. (Tr. 68.) He had personally arrested individuals for weapons possession and also had recovered a switch blade and gravity knife in the vicinity of 265 Livonia Avenue. (*Id.*)

Officer Sands, who patrols the Tilden Houses "on average . . . once a week[,]" testified that although the dispatcher had advised of a "dispute" rather than an "assault," based on his experience, he expected "there might be criminal activity." (Tr. 7, 19.) Officer Sands further testified that in his experience, "there's [a] good reason why . . . people pick up the phone and call [the] police for a dispute, it's not just an average run of the mill argument between two people, it suggests that there might be some violence involved . . . ." (Tr. 20.) Sands testified that because "the Central dispatcher

said they were fighting . . . there's a possibility that there might have been an assault that was in progress, not just . . . a plain heated argument between two individuals." (*Id.*)

Upon their arrival to 265 Livonia Avenue, the testifying officers met outside of the building with the two officers that had been on foot patrol, and they all proceeded by elevator to the 14th floor. (Tr. 13.) Once on the 14th floor, the officers heard loud music coming from "somewhere on the floor[,]" suggesting there was a party. (Tr. 22, 24, 34, 45, 71.) Upon exiting the elevator, some officers went to the left and the testifying officers went to the right, toward the source of the music. None of the testifying officers observed a dispute or any criminal activity in progress. (Tr. 19, 60, 65, 83.) The hallway was described as "very narrow[,]" approximately four to five feet wide. (Tr. 30, 49-50.)

The testifying officers observed between two and seven individuals standing in the hallway leading to four apartments. (Tr. 14, 29, 30, 45, 56, 72, 82.)[1] The officers observed that

---

[1] Officer Sands testified that he saw at least two individuals in the hallway, including defendant, but that "there may have been other people . . . ." (Tr. 29.) Sergeant Morency recalled seeing "about three to four individuals" but did not "remember exactly . . . ." (Tr. 45.) On direct examination, Officer Broderick testified that he saw "four, five or six" individuals, however, on cross-examination he testified that he saw up to seven. (Tr. 72, 82.) Defendant testified that after he left the party in the apartment, he observed seven or eight

several individuals in the hallway, including defendant, initially were walking towards the officers, in the direction of the elevators. (Tr. 17-18, 45, 82-83.) Officer Sands testified that when he first saw defendant, defendant was approximately 10 to 12 feet behind an individual that was closest to the officers as the officers entered the hallway from the elevators. (Tr. 14, 17.) In an effort to investigate the reported dispute, the officers called out to the individuals to speak with them. (Tr. 14, 45, 56, 73.)

Of the individuals that were observed in the hallway, defendant was the only person who, upon seeing the officers, stopped, turned around abruptly and walked in the opposite direction "very fast," back toward the apartment from which the loud music was originating. (Tr. 14, 45-47, 60, 111.) There are no elevators, stairs or exits at that end of the hallway. (Tr. 18.) Contrary to defendant's assertion in a December 18, 2008 affirmation submitted in connection with the present motion to suppress, wherein defendant stated that he "continued on [his] way down the hallway" upon seeing the officers, at the suppression hearing, consistent with the officers' testimony, defendant testified that he "turned around and walked away" from

_____

individuals in the hallway nearest the elevator and "two seconds after that, a bunch of cops came out." (Tr. 112.)

the officers.  (*Compare* Doc. No. 12, Affirmation of Rashun
Mitchell ("Mitchell Aff.") ¶ 2, *with* Tr. 112.)  Sergeant
Morency, who was followed by Officer Broderick and Officer
Morra, approached and followed defendant, and repeatedly called
out and requested to speak with him.  (Tr. 45-46, 56, 58, 73,
85.)  Consistent with the officers' testimony, defendant
testified that he "ignored" the officers and "kept walking . . .
towards the apartment . . . ."  (Tr. 45, 112.)  Defendant said
the sergeant followed him down the hallway calling out to him
but he ignored him.  (Tr. 117.)

Although all of the officers agree that they did not
see defendant commit an illegal act, there is some variation in
the officers' testimonies regarding their impression of and
responses to defendant's actions.  Officer Sands testified that

> [W]henever somebody . . . sees a police officer
> in uniform and stops . . . freezes for a second
> and then starts walking the [sic] other
> direction, it's a red flag to us that that person
> is involved in something.  So, it raises one's
> level of suspicion . . . .  At that point I don't
> have a specific idea of what he or she might be
> doing but that sort of reaction to a police
> presence is definitely a good reason to approach
> a person and see what they're up to . . . .
>
> . . .
>
> [W]e had a call of a large group fighting in the
> hallway.  . . . [I]t is a confined space so I
> would be a little worried that that person might
> be involved in the dispute, might be involved in
> possible criminal activity stemming from the

dispute so I would be suspicious that he might be . . . involved in that criminal activity.

. . .

There was no criminal activity at that point . . . that we could see. We did receive a radio run which indicated that there might be criminal activity. So, it was our job . . . to assume that there was criminal activity and if there was criminal activity, want to find out who was involved in it.

(Tr. 19-20.) Sergeant Morency testified that he followed defendant after he stopped, turned around and walked quickly away because he did not "stop to talk to me like the other guys did . . . because . . . I thought he was involved in the dispute, that's why he didn't want to talk to me." (Tr. 48.) Officer Broderick, who followed behind Sergeant Morency, testified that "[b]ecause we needed to gather some basic information from individuals in the hallway [. . . defendant] being the only individual that did not respond to us, raised my suspicion that he might know something that might be useful to the investigation of the radio call." (Tr. 74.) When Officer Broderick was asked by the court "[w]as there anything that you observed the defendant do that, in your mind, appeared to you to be criminal in nature or caused you to suspect the defendant of criminal conduct[,]" Broderick responded in the negative. (Tr. 90.) Officer Broderick testified that he followed Sergeant Morency's lead and, as mentioned below, Sergeant Morency initially followed and ultimately seized and frisked defendant.

Sergeant Morency testified that he caught up to the defendant as the defendant approached the door to the apartment from which music was emanating at the opposite end of the hallway. (Tr. 46, 60.) Sergeant Morency testified that upon reaching defendant, he immediately "placed" his hand on defendant's shoulder. (Tr. 61.) Officer Broderick testified that he "proceeded to walk around the sergeant" and put his hand on defendant's opposite shoulder, on the left side of defendant's body. (Tr. 86.) Sergeant Morency testified that upon making physical contact with defendant, defendant "started waving his hands around, he was flailing his arms around." (Tr. 48.) Similarly, Officer Broderick testified that "[o]nce we placed our hands on the individual, he became very resistant; floundering around, squirming." (Tr. 74.)

Sergeant Morency and Officer Broderick both credibly testified that defendant's resistance caused them to move defendant away from the apartment door and place defendant's hands on the adjacent wall. (Tr. 47-48, 73.) Sergeant Morency testified that defendant "started flailing his arms around so what I did, I placed him on the wall . . . and I proceeded to pat him down." (Tr. 48-49.) Sergeant Morency further testified that the Tilden Houses are "really known to be [a] very high crime building where people are known to carry weapons, all kind

of weapons. So, I was patting him down for his own safety and also for my own safety and also the officers that were with me, for their safety also." (Tr. 49.) Similarly, Officer Broderick testified that defendant "continued to squirm" which caused Broderick to "ge[t] a little worried that he [defendant] was . . . going to take a swing at us . . . [s]o we put his hands up on the wall away from his waistband, which is what we're taught." (Tr. 74.) Officer Broderick testified that "[o]nce the gun was recovered, the sergeant did give the order to have everybody else in the hallway frisked to make sure there were no other weapons on in the hallway." (Tr. 76.)

Sergeant Morency frisked defendant by first patting down defendant's "midsection and upper pants area." (Tr. 75-75; *see also* Tr. 48-49.) During the pat down, Sergeant Morency recovered a handgun from defendant's front right pants pocket. (Tr. 51.) Sergeant Morency testified that the pat down lasted "about ten seconds" and that prior to feeling the gun in defendant's pants, he did not reach into any of the defendant's pockets, lift up defendant's shirt, or reach under his clothing. (Tr. 51.) Defendant described a pat down of his arms and torso and testified that the officer also felt his waistband, but did not go into his pockets before or after he found the gun. (Tr.

125-126.) Upon recovery of the handgun, plaintiff was placed under arrest. (Tr. 78-79.)

By contrast to the officers' testimony, defendant testified that upon arrival to the 14th floor, the officers "grabbed the individuals [in the hallway], put them against the wall and started searching them. . . . [T]hey grabbed everyone and started frisking them." (Tr. 111-112.) Similarly, Bernard Lee, defendant's friend of 20 years, testified that when he first saw officers arrive on the 14th floor, he "continued to walk, but he [a tall Caucasian officer] pushed me against the wall and told me not to move." (Tr. 93-94.) Mr. Lee testified that he put his hands up because he "didn't want to get shot for something" and that the officer, without asking Lee any questions, "started going in my pockets and searching." (Tr. 94-95.)

Defendant further testified that he did not flail his arms, squirm, or otherwise resist. (Tr. 114-115) Instead, defendant testified that an officer "ran after me and threw me against the wall. I had my hands up against the wall. . . . Automatically I just put my hands up on the wall because I don't want to reach or nothing. And then, you know, if something happens you know." (Tr. 112-113.)

The Court does not credit defendant's testimony that officers seized and frisked everyone on the 14th floor immediately upon arrival. Indeed, defendant's December 18, 2008 affirmation never mentions this version of the events. In contrast to his testimony, defendant's affirmation simply states that when he entered the hallway, he observed police officers and one of the officers asked to speak with defendant. (Mitchell Aff. ¶ 2.)

Nor does defendant's affirmation specify whether defendant voluntarily or involuntarily placed his hands against the wall while being frisked. Instead, in his affirmation, defendant simply states that after being "grabbed" by an officer, "I stood with my hands against the wall for a period of time before another officer frisked me . . . ." (Mitchell Aff. ¶ 3.) Defendant's affirmation does not mention that defendant "automatically" placed his hands against the wall without being directed to do so by the officers.

Moreover, whereas defendant states in his affirmation that he declined to speak with the officers and "continued on my way down the hallway[,]" in stark contrast, defendant testified at the suppression hearing that he "turned around and walked away" from the officers, "towards the apartment . . . ." (Tr.

112.) When confronted on cross-examination about this inconsistency, defendant testified,

> Q: [In your affirmation] [d]id you say anything about turning around and going the other way?
>
> A: No.
>
> Q: In fact, in your affirmation you wrote, "One of the officers asked to speak to me. I said no and continued on my way down the hallway." Isn't that true?
>
> A: Yes. My lawyer know what I meant by continuing down the hallway.
>
> Q: By continuing on your way down the hallway, you meant turn around and go in the other direction? Is that what you meant?
>
> A: Yes.

(Tr. 120-121.) The court finds that the contradictions between defendant's affirmation and testimony significantly undermine defendant's credibility.

Mr. Lee's testimony is similarly not credible. Mr. Lee's testimony revealed a clear bias in favor of the defendant. Specifically, Mr. Lee, defendant's friend of 20 years, testified that he was "upset" by defendant's arrest and did not want defendant to be convicted of gun possession. (Tr. 93, 100, 105.) Lee further testified that he "argued" with the police immediately after defendant's arrest and followed the police downstairs "to make sure he [defendant] was okay" because the

police were "being rough with him when they put him in the elevator." (Tr. 104-105.)

Mr. Lee's testimony was also contradictory with respect to his own interactions with the police on the morning of defendant's arrest. On direct examination, Mr. Lee testified that upon seeing the police enter the 14th floor, he immediately put his hands up because he "didn't want to get shot for something." (Tr. 94.) On cross-examination, however, Lee retracted from his earlier testimony:

> Q:   Your testimony is you put your hands up, is that right?
>
> A:   Yes.
>
> Q:   You didn't want to get shot?
>
> A:   Or anything.
>
> Q:   You were concerned about getting shot?
>
> A:   I wouldn't say that.

(Tr. 99.)

The court credits the testimony of Sergeant Morency and Officer Broderick regarding the events leading up to and during defendant's seizure and frisk. Sergeant Morency and Officer Broderick corroborated each others' testimony regarding the specific manner in which defendant resisted, describing defendant's actions as "flailing" his arms, "squirming" and "floundering around." (Tr. 48, 74.) Moreover, defendant

testified that he knew it was illegal to carry a gun and that he could go to jail if he was caught carrying a gun (Tr. 112), thus adding weight to the testimony of Officer Broderick and Sergeant Morency. Defendant admitted that the gun was loaded with a bullet in the chamber, ready to be fired. (Tr. 123.)

Following defendant's arrest, defendant was advised of his *Miranda* rights. (Tr. 123.) Defendant testified that he understood his rights and signed a written waiver of those rights. (*Id.*; *see* Mitchell Aff. ¶ 5.) Thereafter, defendant "wrote out a confession admitting to possessing the pistol." (Mitchell Aff. ¶ 5; *see* Tr. 123.)

## DISCUSSION

Consistent with the Fourth Amendment to the United States Constitution, "the police can stop and briefly detain a person for investigative purposes." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Such a detention is known as a "*Terry*" stop, and requires that "the officer [have] a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 30); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (officer must have "reasonable suspicion" to perform a *Terry* stop).

15

The parties do not dispute that defendant's encounter with Sergeant Morency and Officer Broderick constituted a *Terry* stop requiring reasonable suspicion. Instead, they dispute whether reasonable suspicion existed to support defendant's seizure and search.

To determine whether there was reasonable suspicion for a *Terry* stop, the court must first determine the precise moment that the *Terry* stop was executed by the officers, namely, when defendant was "seized," because only "the facts available to the officer at the moment of the seizure" may be evaluated in determining whether reasonable suspicion warranted the detention. *Terry*, 392 U.S. at 21-22. The court must then determine whether, based on the facts known to the officers at the time of seizure, there was some objective justification for stopping the individual that is more than an "inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (citing *Sokolow*, 490 U.S. at 7; *Terry*, 392 U.S. at 27) (internal quotation marks omitted).

## A. Seizure

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person

would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991) (a seizure has occurred when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen"). In the context of the Fourth Amendment, "[a] seizure occurs when (1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained." *United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009) (quoting *United States v. Swindle*, 407 F.3d 562, 572 (2d Cir. 2005)).

In this case, when Sergeant Morency and Officer Broderick responded to the call regarding a dispute and first observed defendant, defendant stopped while walking towards them, turned around and quickly walked in the opposite direction. The officers repeatedly called out and requested to speak with defendant (Tr. 45-46, 56, 58, 73, 85), however, defendant testified that he "ignored" the officers and "kept walking." (Tr. 112.) Clearly, at that point, defendant's freedom was not restrained, considering the fact that defendant walked away from the officers after the officers asked to speak to him. *See United States v. Jackson*, 548 F. Supp. 2d 24, 28 (W.D.N.Y. 2008) ("The fact that the officers were pursuing

[defendant], and . . . ordering him to halt, did not cause the defendant to be seized."); *see also California v. Hodari D.*, 499 U.S. 621, 626-629 (1991) (holding that a seizure did not occur when the defendant fled from an officer giving chase; instead, a seizure occurred when the defendant was tackled by the officer).

Under the Supreme Court's reasoning in *Hodari D.*, here, defendant was unequivocally "seized" when Sergeant Morency, first, and then Officer Broderick laid their hands on defendant's shoulders. *See id.* at 626 (observing that "[t]he word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement . . . ."); *see also United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990) (enumerating factors relevant to seizure inquiry, including "physical touching of the person by the officer"). In short, a reasonable person in defendant's circumstances would have concluded at that point that he was not free to leave. *Bostick*, 501 U.S. at 434.

## B. Reasonable Suspicion to Stop Defendant

Having found that defendant was seized when Sergeant Morency and Officer Broderick laid their hands on defendant's shoulders, the court must next address whether the officers possessed reasonable suspicion at that time. *Florida v. J.L.*, 529 U.S. 266, 271 (2000) ("The reasonableness of official

suspicion must be measured by what the officers knew before they

conducted their" seizure).  As the Supreme Court stated in

*Ornelas v. United States*, 517 U.S. 690, 697 (1996),

> The principal components of a determination of
> reasonable suspicion . . . will be the events
> which occurred leading up to the stop or search,
> and then the decision whether these historical
> facts, viewed from the standpoint of an
> objectively reasonable police officer, amount to
> reasonable suspicion . . . .  The first part of
> the analysis involves only a determination of
> historical facts, but the second is a mixed
> question of law and fact: The historical facts
> are admitted or established, the rule of law is
> undisputed, and the issue is whether the facts
> satisfy the [relevant] statutory [or
> constitutional] standard, or to put it another
> way, whether the rule of law as applied to the
> established facts is or is not violated.

(internal quotations omitted)(alterations in original).  While

"[a]rticulating precisely what 'reasonable suspicion' . . .

mean[s] is not possible," *Ornelas*, 517 U.S. at 695, the Supreme

Court has described it as "a particularized and objective basis

for suspecting the particular person of criminal activity,"

*United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

"Reasonable suspicion is an objective standard; hence, the

subjective intentions or motives of the officer making the stop

are irrelevant."  *United States v. Bayless*, 201 F.3d 116, 133

(2d Cir. 2000) (citing *United States v. Glover*, 957 F.2d 1004,

1009 (2d Cir. 1992)).

Further, "the proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing." *Lee*, 916 F.2d at 820; *see also United States v. Arvizu*, 534 U.S. 266, 273 (2000) (courts must look at the "totality of the circumstances" when making reasonable suspicion determinations). Even conduct that is, by itself, lawful or ambiguous and susceptible of an innocent explanation may, under certain circumstances, justify a *Terry* stop. *See Wardlow*, 528 U.S. at 126. The Supreme Court has instructed that "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Id.*, 528 U.S. at 125 (citation omitted). The court evaluates the totality of the facts from the perspective a trained and experienced officer. *Cortez*, 449 U.S. at 418.

The government points to three factors which, it contends, provided the officers with reasonable suspicion to suspect that defendant was engaged in criminal activity: (1) defendant's presence in a high-crime area, (2) that officers had received a report of a "large" dispute which involved "fighting," and (3) defendant's nervous, evasive behavior. (Doc. No. 24, Government's Suppl. Mem. of Law in Opp. to Motion to Suppress, at 18-22.) Each of these factors will be

considered in turn and in combination to determine whether the totality of circumstances established that the officers had a reasonable suspicion to stop defendant.

First, although an individual's presence in a "high-crime area" is not in itself sufficient to justify a *Terry* stop, it may properly raise an officer's suspicions of criminality. *See Wardlow*, 528 U.S. at 124-26 (officers may take into account relevant characteristics of a location, such as whether it is a high-crime area, in determining whether a *Terry* stop is warranted); *United States v. Muhammad*, 463 F.3d 115, 123 (2d Cir. 2006) (presence in a high-crime area contributes to a finding of reasonable suspicion). "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124.

Here, the parties do not dispute that 265 Livonia Avenue, the location at which the defendant was stopped, is part of the Tilden Houses, a "notorious" site, located in a high-crime area known for violent crime. (*See* Tr. 6-10, 45, 49, 68-69.) Sergeant Morency testified that he patrols the Tilden Houses "[a]t least once a day" and that during the evening before defendant's arrest, he had been involved in the

investigation of three separate shootings in and around the
vicinity of the Tilden Houses. (Tr. 43-44.) Sergeant Morency
further testified that, despite the presence of other officers,
he responded to the radio call concerning the reported because
"the location was 265 Livonia . . . it is a very high crime
building, that's why I have to respond just in case the other
officers . . . need my help." (Tr. 45.) Similarly, Officer
Broderick, who had recently witnessed violent crimes in the
vicinity of 265 Livonia Avenue, testified that "[m]y sergeant
[Morency] felt that they would need backup, them being only two
officers." (Tr. 69-70.) Moreover, Officer Sands, who was not
one of the officers that seized defendant, testified that gangs,
such as the Bloods and the Crips, often engage in violence in
the vicinity of the Tilden Houses. (Tr. 9-10.) Accordingly,
the court must take into account that the location of
defendant's seizure and arrest was within an area known by the
officers to have a history of criminal activity and violence.

The court observes that the time of night also may be
considered as a factor in determining whether the officers had
reasonable suspicion to justify stopping defendant. *See United
States v. McPhatter*, No. 03-CR-911, 2004 U.S. Dist. LEXIS 2754,
at *4-6 (E.D.N.Y. Feb. 24, 2004) (observation of the defendant
at around 1:00 a.m. in a high-crime area with what appeared to

be an open bottle of beer provided a reasonable suspicion of criminal activity to warrant an investigatory stop, and subsequent discovery of firearm was proper).  Here, the officers consistently testified that they arrived at 265 Livonia Avenue in the "early morning" of October 11, 2008, at approximately 2:00 a.m.  (Tr. 11, 43, 69.)  Thus, this particular time of night provides some additional support for a reasonable police officer's suspicions to be raised.

Next, the government contends that the officers' receipt of a report of a large dispute on the 14th floor of 265 Livonia Avenue, which involved "fighting," properly factored into their decision to seize defendant.  As defendant notes, this is not a case where the officers received information from an anonymous informant regarding criminal activity or where a "tipster" had provided a description of a suspect.[2]  *Cf. Florida*

---

[2]      Defendant cites to *Muhammad* and *United States v. Simmons*, *supra*, as examples where courts have properly found reasonable suspicion to exist where officers, *inter alia*, had information about a suspect's description.  (Doc. No. 25, Defendant's Reply Mem. of Law in Support of Motion to Suppress, at 4-5.)  Defendant points out that the present case is distinguishable from *Mohammad* and *Simmons* insofar as the officers never were provided with a description of any suspect, let alone a description of him.  Thus, defendant contends that absent a description of defendant, the other factors are insufficient to give rise to reasonable suspicion.
        Defendant's reliance on *Mohammad* and *Simmons* is inapposite.  In *Mohammad*, the Second Circuit found that an anonymous informant's description of the suspect lacked sufficient reliability, and therefore, concluded that the district court

*v. J. L.*, 529 U.S. 266, 270-71 (2000) (holding that information from an anonymous informant generally requires some sort of corroboration to be considered reliable). Instead, it appears that the government relies on the dispatcher's report of a large dispute involving "fighting" to demonstrate that the officers were alerted to the possibility that they would encounter a dangerous situation on the 14th floor of 265 Livonia Avenue. (*See* Doc. No. 26, Government's Reply Mem. of Law in Opp. to Motion to Suppress, at 3.)

    In addition to the officers' general awareness that 265 Livonia Avenue was high-crime building, there is no dispute that the officers were specifically advised by the dispatcher of a large crowd and "fighting" on the 14th floor. (Tr. 12-13 and Gov't Ex. 2.) As previously noted, Officer Sands testified that, based on his experience, although a "dispute isn't -- technically speaking . . . criminal in and of itself . . . there's [a] good reason why . . . people . . . call [the] police

---

correctly found reasonable suspicion where it relied on other factors, namely, the officer's observation of the suspect's flight in a high-crime area. In *Simmons*, the Second Circuit concluded that an anonymous tip received during a 9-1-1 call, coupled with observations of officers arriving at the scene, justified seizure. The Court pointed to "additional factors that supported the stop" such as the defendant's late at night presence in a high-crime area, his non-compliance with an order to stop, and hands in his pockets suggesting to the officers that the defendant was concealing a weapon. *Simmons*, 560 F.3d at 108.

for a dispute, it's not just an average run of the mill argument between two people, it suggests that there might be some violence involved . . . ." (Tr. 20.) Thus, in evaluating whether the officers had reasonable suspicion to stop defendant, the court finds that it was reasonable for the officers to take into account the dispatcher's report of a "large" dispute involving "fighting," in the context of their experience with violent crime, the building, the Tilden Houses and vicinity. *See Arvizu*, 534 U.S. at 273 (officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.") (internal quotation marks and citation omitted).

The court next considers the third factor, and the obvious motivating reason why the officers stopped defendant: that upon seeing the officers, defendant stopped while walking towards the officers, turned around, quickly walked away in the opposite direction and ignored the officers' repeated attempts to gain his attention. As a general rule, "[a]n individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business, and his refusal to cooperate may not form the basis for his detention." *Muhammad*, 463 F.3d at 123 (citing *Florida v. Royer*,

460 U.S. 491, 498 (1983)).  "But unprovoked flight is simply not a mere refusal to cooperate.  Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Muhammad*, 463 F.3d at 123 (quoting *Wardlow*, 528 U.S. at 125).

While unprovoked flight alone is not enough to justify a *Terry* stop, the Supreme Court held in *Wardlow* that flight upon noticing police, plus some other indicia of wrongdoing, can constitute reasonable suspicion.  *See* 528 U.S. at 125-26.  In *Wardlow*, the defendant's flight plus his presence in a high-crime area justified a *Terry* stop.  The Court explained that "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior."  *Id.*

Here, it is undisputed that upon seeing the officers, defendant stopped, turned around and walked away "very fast" in the opposite direction, and continued walking rapidly toward the apartment from which the loud music was originating, as the officers repeatedly called out to him and followed him. (Tr. 14, 45-47, 60, 111.)  At the suppression hearing, defendant testified that, upon seeing the officers, he "turned around and walked away . . . towards the apartment . . . ."  (Tr. 112.) Sergeant Morency testified that he pursued defendant because defendant did not "stop to talk to me like the other guys did .

. . . I thought he was involved in the dispute, that's why he didn't want to talk to me." (Tr. 48.)

A change in direction and speed are factors upon which courts have relied in describing behavior as suspicious. *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) ("[E]rratic driving or obvious attempts to evade officers can support a reasonable suspicion."); *Muhammad*, 463 F.3d at 119 (affirming finding of reasonable suspicion where suspect on bicycle increased speed, tried to pass one patrol car and steer around another); *Cf. United States v. McCrae*, No. 07-CR-772, 2008 U.S. Dist. LEXIS 2314, at *8 (E.D.N.Y. Jan. 11, 2008) (finding no reasonable suspicion where defendant "calmly walked away from . . . [the police officer], shaking hands with the people he was standing with before leaving and at no time quickening his pace."); *see also Wardlow*, 528 U.S. at 123-25 (Reasonable suspicion existed where defendant was in an area known by officers for heavy drug trafficking saw a person holding an opaque bag who left in unprovoked, "headlong flight" as soon as he noticed the police).

The court finds that defendant's evasion upon seeing the police, by stopping while walking in the direction of the police, turning around and quickly walking away in the opposite direction, having been asked by the officers if they could speak

with him, and then continuing to walk away as Sergeant Morency and Officer Broderick followed and called out to defendant to gain his attention, supports a finding of reasonable suspicion. The court finds that the undisputed evidence — defendant's evasion of the police, his presence in a high-crime area, and the officers' knowledge and experience regarding the possibility that they would encounter a dangerous situation — provides a basis for reasonable suspicion when viewed in totality.

## C. Reasonable Suspicion to Frisk Defendant

Having found that there was reasonable suspicion to stop defendant, "[t]he next question is whether Sergeant Morency had reasonable suspicion to frisk" defendant. *See Simmons*, 560 F.3d at 108 (citing *Arizona v. Johnson*, __U.S.__, 129 S. Ct. 781, 784, 172 L. Ed. 2d 694 (2009) (describing the "two conditions" for a constitutional *Terry* "stop and frisk": (1) the officer has reasonable suspicion "that the person apprehended is committing or has committed a criminal offense"; and (2) "to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous")). An officer may conduct a pat-down frisk for weapons if the officer possesses a reasonable suspicion that the person possesses a weapon. *See Ybarra v. Illinois*, 444 U.S. 85, 93 (1979); *see also Maryland v. Buie*, 494 U.S. 325, 334-335 n.2

(1990) ("Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk [of persons or areas] for weapons can be conducted.")

Here, the evidence establishes that Sergeant Morency frisked defendant in response to defendant's resistance to being stopped. Sergeant Morency, whose testimony was corroborated by Officer Broderick, credibly testified that immediately after laying his hands on defendant's shoulders, defendant became uncooperative by "flailing his arms around so what I did, I placed him on the wall next to the door and I proceeded to pat him down." (*See* Tr. 48-49, 74.) Sergeant Morency further testified that defendant's resistance, which occurred in a "very narrow hallway," raised concerns about his own safety, as well as the safety of the other officers and defendant. (Tr. 49-50.) Given the officers' detailed descriptions of defendant's conduct, the court does not find credible defendant's testimony that he did not flail or move his arms.

In view of defendant's evasion and subsequent resistance, and the nature of the investigation, which involved the officers responding to a "large group . . . fighting" in the hallway of a high-crime building in the middle of the night, the court finds that Sergeant Morency had reasonable suspicion to

conclude that defendant might have been armed and dangerous.
*See United States v. Soares*, 521 F.3d 117, 122 (1st Cir. 2009)
(among other things, the defendant's "constant arm-flailing and
rocking back and forth . . . contributed to the officers'
suspicions and fears" that the defendant was armed).
Accordingly, the handgun and ammunition were lawfully seized and
are admissible. The defendant's motion to suppress the handgun
and ammunition is therefore denied.

### D. Post-Arrest Statements

Defendant does not dispute that his post-arrest
statements were voluntarily obtained. Instead, defendant
asserts that his statements should be suppressed as fruit of an
illegal seizure and search.

Because the court has found that defendant's seizure,
search and subsequent arrest were lawful, there is no reason to
suppress defendant's post-arrest and post-*Miranda* statements.
Accordingly, defendant's motion to suppress the post arrest
statements is denied.

## CONCLUSION

For the foregoing reasons, the court denies defendant's motion to suppress in its entirety. The parties shall appear for a status conference on June 1, 2009 at 12:30 p.m.

SO ORDERED.

Dated:  Brooklyn, New York
        May 27, 2009

_____  /s/_____ _____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York